UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


YVETTE COLEMAN,                    )
                                   )
          Plaintiff,               )
                                   )          CIVIL ACTION NO.
VS.                                )
                                   )          3:16-CV-1439-G
BANK OF AMERICA, N.A., ET AL.,     )
                                   )
          Defendants.              )


MEMORANDUM OPINION AND ORDER


Before the court is the defendants' motion for summary judgment pursuant to

FED. R. CIV. P. 56 (docket entry 52) and the motion of the plaintiff to strike the

defendants' summary judgment evidence (docket entry 56).  For the reasons stated

below, the defendants' motion is granted and the plaintiff's motion is denied.

I.  BACKGROUND

A.  Factual Background

The plaintiff, Yvette Coleman ("Coleman"), an African American woman, was

employed as an anti-money laundering representative for the defendant, Bank of

America, N.A. ("the Bank"), since January 2011.  Defendants' Memorandum in

Support of Their Motion for Summary Judgment ("Supporting Memorandum") at 4 (docket entry 53); Plaintiff's Second Amended Complaint ("Second Amended Complaint") ¶¶ 8, 16 (docket entry 40). Coleman's suit arises from her termination from the Bank on April 20, 2016. According to the Bank, Coleman was terminated due to activity on her personal, joint checking account she held with her mother at the Bank. Supporting Memorandum at 4, 6. The Bank trains its tellers to report transactions or actions by customers that might violate banking laws and regulations. *Id.* at 4. The Bank's employee handbook states "[y]ou must not take any action, either personally or on behalf of the company, that will violate any law or regulation affecting our business." *Id.* Likewise, the Bank's code of conduct states "[w]e must not take any action, either personally or on behalf of Bank of America, which violates any law, rule, regulations or internal Company policies or procedures." *Id.*

The Bank must file a currency transaction report ("CTR") for "each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." 31 C.F.R. § 1010.311. It is illegal to structure or attempt to structure any transaction to evade this requirement. 31 U.S.C. § 5324(a)(3); 31 C.F.R. § 1010.314(c). A person structures a transaction if:

> [T]hat person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in

> any manner, for the purpose of evading the reporting
> requirements under § 1010.311. . . .

31 C.F.R. § 1010.100(xx).

"In any manner" includes, but is not limited to, "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000." *Id.* The transaction or transactions need not exceed the $10,000 threshold at any single financial institution on any single day to constitute structuring. *Id.*

The Bank asserts that on February 10, 2016, a teller at one of the Bank's Dallas area branches reported through its transaction reporting management system ("TRMS") a transaction by Coleman, who was there as a customer. Supporting Memorandum at 4. The teller reported that Coleman withdrew $9,500 cash, wanted to move money from her account at the Bank to an account at another bank, and wanted to avoid filling out the paperwork. *Id.* The teller reported that after she told Coleman she could fill out a CTR if she needed to take out more, Coleman said she would just take some out little by little. *Id.* Then, on February 18, 2016, a teller at another Dallas area branch reported through TRMS that Coleman wanted to withdraw $9,500 cash after already cashing a check for over $600. *Id.* at 5. After she told Coleman she had to file a CTR, she decided to withdraw $9,000 to avoid the CTR. *Id.* These TRMS reports were given to Cheri Lollman ("Lollman"), a senior

investigator at the Bank. *Id.* While reviewing Coleman's transaction history, Lollman found additional transactions just below the CTR threshold: on March 7, 2016, Coleman withdrew $8,000 cash; on March 17, 2016, Coleman wrote a check to herself for $9,500; and on April 12, 2016, Coleman withdrew $9,000 cash. *Id.*

The Bank contends that on April 18, 2016, Lollman spoke with Jeremy Kaster ("Kaster"), Coleman's third-level manager, and said she needed to talk with Coleman about her account activity. *Id.* Later that day, Lollman spoke with Coleman, and Coleman confirmed that she completed the Bank's financial crimes compliance training. *Id.* She also confirmed that she changed a withdrawal amount after being told a CTR would have to be completed because she did not want to do the paperwork. *Id.* at 5-6. Coleman asked why she was being questioned, and Lollman explained that her activity showed a pattern of structuring. *Id.* at 6.

Coleman asserts that she did not engage in structuring because she used the money for lawful reasons, and because she did not attempt to conceal the money's origin or the nature of the transactions. Second Amended Complaint ¶ 9. Coleman explained to Lollman that the money was the proceeds of an insurance check payable to her mother for personal items stolen from her mother's house, that she was moving the money from the joint account to her own account at another bank, and that she then used the money to pay contractors and buy supplies. Supporting Memorandum

at 6.  Lollman concluded, however, that Coleman's personal banking activity was consistent with structuring.  *Id.*

On April 20, 2016, Lollman spoke with Vince Dubman ("Dubman"), an employee relations consultant, and explained that Coleman's banking activity was consistent with structuring.  *Id.*  Dubman decided that Coleman's employment should be terminated because violating the law is against the Bank's employee handbook and code of conduct.  *Id.*  Dubman and Lollman then called Tommy Brock ("Brock"), Coleman's second-level manager, and explained that Coleman's banking activity was consistent with structuring and recommended that Coleman be terminated.  *Id*. at 6-7.  Both Brock and Kaster supported and accepted the recommendation.  *Id.* at 7.  On April 20, 2016, Kaster and Brock informed Coleman that her employment was terminated effective immediately.  *Id.*

Coleman contends that the Bank's reason for terminating her was a pretext for racial discrimination.  Second Amended Complaint ¶ 9.  Coleman asserts that a few days before her termination, Kevin Bennett ("Bennett"), a white male co-worker, sent an e-mail complaint about Coleman and requested that she be terminated.  *Id.* ¶ 11.  Coleman alleges that "the complaint surrounded an incident where she reproached Bennett for being reckless and hitting her with a door."  *Id.*  Coleman implies that the complaint played a role in her termination.

B. <u>Procedural Background</u>

Coleman brought her original complaint against Bank of America, Corporation on May 26, 2016.  *See* Plaintiff's Original Complaint (docket entry 1).  Coleman alleged one count of discriminatory termination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  *Id.* at 3.  On July 20, 2016, Coleman amended her complaint to substitute the proper defendant, Bank of America, N.A.  *See* Plaintiff's First Amended Complaint (docket entry 15).  On March 29, 2017, Coleman amended her complaint again to add a retaliation claim against the Bank, to add two individual defendants, Kaster and Brock, and to add a defamation claim against Kaster and Brock.  *See* Second Amended Complaint.  Her claims now include:  racial discrimination under Title VII and 42 U.S.C. § 1981 ("Section 1981"); retaliation under Title VII, Section 1981, and 42 U.S.C. § 12101 ("FMLA"); and defamation against Kaster and Brock.  *Id.*

The defendants filed the instant motion for summary judgment, their supporting memorandum, and supporting appendix on May 26, 2017.  *See* Defendants' Motion for Summary Judgment (docket entry 52); Supporting Memorandum; Defendants' Appendix in Support of Their Motion for Summary Judgment ("Appendix in Support") (docket entry 54).  On June 16, 2017, the plaintiff filed a motion to strike the defendants' summary judgment evidence.  Motion to Strike Defendants' Summary Judgment Evidence ("Plaintiff's Motion to

Strike") (docket entry 56).  On July 7, 2017, the defendants filed a timely reply in support of their summary judgment motion.  *See* Defendants' Reply in Support of Their Motion for Summary Judgment (docket entry 62).[1]  The motions are now ripe for decision.

## II. ANALYSIS

### A. Summary Judgment Legal Standard

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c)(1).[2]  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit.  *Anderson v.*

---

[1]     Coleman timely filed a response brief (docket entry 55-1), but it lacked arguments or authorities.  Coleman then filed a motion for leave to file a corrected response brief (docket entry 57), which included as an exhibit a new response brief (docket entry 57-1).  However, some pages were unreadable due to the ECF filing stamp.  Coleman then filed an amended motion for leave to file a corrected response brief (docket entry 58), with a corrected response brief attached.  *See* Plaintiff's Response Brief in Opposition of Motion for Summary Judgment (docket entry 58-1).  On July 10, 2017, the court granted Coleman's amended motion for leave to file, and set the deadline to file her corrected response and appendix for July 12, 2017 (docket entry 66).  Coleman has missed the deadline to file her corrected response.  The defendants' reply is in response to the plaintiff's proposed response brief.

[2]     Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in her favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response

to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## 1. *Coleman's Evidentiary Objections*

Before considering the merits of the defendants' motion, the court must address Coleman's objections to evidence cited in the defendants' appendix. *See* Plaintiff's Motion to Strike. The court will only consider the evidentiary objections specifically raised by Coleman. See *Eguia v. Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985) ("Documents presented in support of a motion for summary judgment may be considered even though they do not comply with the requirements of Rule 56 if there is no objection to their use.").

Coleman has moved to strike portions of declarations that the defendants submitted with their motion. Coleman challenges paragraphs 4, 5, 7, 8, 10, and 11 of Lollman's declaration because they contain 'inadmissible hearsay," and also because paragraphs 10 and 11 contain "conclusory self-serving statements." Plaintiff's Motion to Strike at 2-3. Coleman objects to paragraphs 6, 7, and 8 of Dubman's declaration on the grounds that they contain "inadmissible hearsay, and conclusory allegations." *Id.* at 3. Coleman objects to paragraphs 3 and 4 of Kaster's declaration on the grounds that they contain "inadmissible hearsay, and conclusory allegations." *Id.* Finally, Coleman objects to paragraphs 2, 3, 4, and 5 of Brock's

declaration on the grounds that they contain "inadmissible hearsay, and conclusory allegations." *Id.* at 4.

It is unclear, however, which specific statements Coleman believes should be stricken. *See* Plaintiff's Motion to Strike at 2-4. "The court is not required to review large quanta of evidence to ferret out inadmissible statements." *Tucker v. SAS Institute, Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006) (Fish, Chief J.). Rather, Federal Rule of Evidence 103(a)(1) requires an objecting party to make "specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken." *Id.*; *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004). Objections lacking specificity do not satisfy the requirements of Rule 103. *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998). "A loosely formulated and imprecise objection will not preserve error." *Id.* "Rather, a trial court judge must be fully apprised of the grounds of an objection." *Id.*

In *Tucker*, this court denied the plaintiff's motion to strike summary judgment evidence. *Tucker*, 462 F. Supp. 2d at 722. This was because the plaintiff made "vague assertions" that information in affidavits was "based on inadmissible hearsay" and contained "conclusory statements." *Id.* Similarly, Coleman only makes "vague assertions" that portions of Lollman, Dubman, Kaster, and Brock's declarations contain "inadmissible hearsay," and "conclusory self-serving allegations." Plaintiff's

Motion to Strike at 2-4. Therefore, Coleman's motion to strike is denied, because her objections "do not meet the specificity requirement of Rule 103(a)(1)." See *Tucker*, 462 F. Supp. 2d at 722.

### 2. *The Defendants' Motion for Summary Judgment*

The defendants move for summary judgment on Coleman's racial discrimination, retaliation, and defamation claims. The court will analyze whether each claim survives the defendants' motion.

### a. Coleman's Racial Discrimination Claim Against the Bank

As a preliminary matter, the court notes that "the same evidentiary standards apply to claims under Title VII . . . as apply to claims under 42 U.S.C. § 1981." *Tucker*, 462 F. Supp. 2d at 724 (citing *Raggs v. Mississippi Power & Light Company*, 278 F.3d 463, 468 (5th Cir. 2002)). Therefore, evidence that establishes a *prima facie* case of racial discrimination will be the same for both the Title VII and Section 1981 claims. *Id.* "Likewise, evidence of a legitimate, non-discriminatory motive for the employment action will defeat both a Title VII claim and a Section 1981 claim." *Id.* Therefore, since the same standards apply to Coleman's causes of action under both statutes, the court will only directly address Coleman's Title VII claims.

There are two broad types of Title VII cases -- those based on direct evidence, see *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985), and those based on circumstantial evidence, see *McDonnell Douglas Corporation v. Green*, 411 U.S. 792,

802 (1973). *Tucker*, 462 F. Supp. 2d at 724. Differing standards accompany these

two categories. *Id.* Under *Trans World Airlines*, when a plaintiff is able to offer direct

evidence in support of a Title VII claim, the defendant must produce evidence to

show that the adverse employment decision would have occurred even in the absence

of the unlawful purpose. See *Fierros v. Texas Department of Health*, 274 F.3d 187, 192

(5th Cir. 2001). Direct evidence in the Title VII context includes "any statement or

written document showing a discriminatory motive on its face." See *id.* at 195

(quoting *Portis v. First National Bank of New Albany Mississippi*, 34 F.3d 325, 329 (5th

Cir. 1994)). When confronting a motion for summary judgment in a case involving

direct evidence, the plaintiff need only show that retaliatory animus motivated or was

a substantial factor in the adverse employment decision to survive summary

judgment. See *id.* at 195.

In this case, Coleman has presented no direct evidence of discrimination by

the Bank. Thus, Coleman must rely on circumstantial evidence to prove her claim.

When a plaintiff attempts to prove a Title VII violation using circumstantial

evidence, the *McDonnell Douglas* burden shifting analysis applies. *McDonnell Douglas*,

411 U.S. at 802. The initial burden for such claims is on the plaintiff to establish the

*prima facie* elements of her claims. See *Okoye v. University of Texas Houston Health

Science Center*, 245 F.3d 507, 512 (5th Cir. 2001); *Ackel v. National Communications,

Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). Once the plaintiff demonstrates these initial

elements, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. See *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to state such a reason, the burden shifts back to the plaintiff to demonstrate that the reason proffered by the defendant is mere pretext. See *Okoye*, 245 F.3d at 512; *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

To establish a *prima facie* case of racial discrimination in employment under Title VII, the employee must demonstrate that: (1) she is a member of a protected group; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016). The Bank argues, Supporting Memorandum at 8-9, and the court agrees, that Coleman cannot satisfy the fourth element.

First, as the Bank points out, Coleman admitted that she was not sure who she was replaced with, or that she was even replaced at all. Appendix in Support at 059, Oral Deposition of Yvette Coleman ("Coleman Dep."), 161:12-16. Therefore, Coleman cannot establish the fourth element on this basis; she must show that she

was treated less favorably than another similarly-situated employee outside of her protected group.

In her second amended complaint, Coleman asserts that "other individuals, including Kevin Bennett, were treated more favorable than she in the workplace." Second Amended Complaint ¶ 16. Coleman seems to posit that because she was terminated just days after Bennett's complaint -- and the alleged request for her termination -- that he was treated more favorably than her. Appendix in Support at 050-51, Coleman Dep. 148:22-149:1; Appendix in Support at 069-71, Oral Deposition of Lela Harrell ("Harrell Dep.") 15:21-16:3, 17:16-25. However, the defendants point to evidence showing that Bennett did not request that Coleman be terminated. For example, Lela Harrell ("Harrell"), Coleman's direct manager, testified that she "would be surprised" to hear that Bennett wanted her terminated, and that she never heard that Bennett wanted her terminated. Appendix in Support at 070-71, Harrell Dep. 16:1-3, 17:16-18. Also, Brock stated that he was "unaware of Bennett ever asking that Coleman's employment be terminated" and that the decision to terminate Coleman had "nothing to do with the incident." Appendix in Support at 009, Declaration of Howard T. Brock ("Brock Dec.") ¶ 5. Most importantly, nowhere in the e-mail complaint does Bennett request that Coleman be terminated. Appendix in Support at 072, Exhibit 1. There is simply no evidence that Bennett requested that Coleman be terminated.

Moreover, Bennett and Coleman do not appear to be "similarly-situated." The Fifth Circuit has required employees who proffer fellow employees as a comparator to "demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kansas City Southern Railway Company*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Refining Company, Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). Furthermore, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator." *Id.* (quoting *Perez v. Texas Department of Criminal Justice, Institutional Division*, 395 F.3d 206, 213 (5th Cir. 2004)). Therefore, Coleman must provide evidence that Bennett or another Bank employee committed acts that were "nearly identical" to the structuring conduct for which she was terminated. However, by Coleman's own admission, she does not know of any other employees who were investigated for structuring and not terminated. Appendix in Support at 059, Coleman Dep. 161:8-11. As a result, a reasonable jury could not find for Coleman regarding her Title VII racial discrimination claim. The defendants are entitled to summary judgment on this claim.

### b. Coleman's Retaliation Claim Against the Bank

Coleman's second claim is that her employment was terminated in retaliation for her "opposing and complaining of unlawful discriminatory practices" in violation

of Title VII, Section 1981, and "42 U.S.C. § 12101 (FMLA)."  Second Amended

Complaint ¶ 18.[3]

Retaliation claims brought under Title VII, Section 1981, and the FMLA are

analyzed under the *McDonnell Douglas* burden shifting framework.  *Chaffin v. John H.*

*Carter Company, Inc.*, 179 F.3d 316, 319 (5th Cir. 1999), partially abrogated on other

grounds by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).  To

establish a *prima facie* case of retaliation, Coleman must show that:  (1) she

participated in an activity protected by the statute; (2) the Bank took an adverse

employment action against her; and (3) a causal connection exists between the

protected activity and the adverse employment action.  *Willis v. Cleco Corporation*, 749

F.3d 314, 317 (5th Cir. 2014).  The Bank contends that Coleman has no evidence to

establish elements (1) or (3).  Supporting Memorandum at 12.

The defendants argue that because Coleman never complained that she was

treated differently because of her race, she did not engage in protected activity under

Title VII or Section 1981.  *Id.* at 13.  According to the Fifth Circuit, "an employee

has engaged in protected activity when she has (1) 'opposed any practice made an

unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted,

---

[3]     The defendants recognize that 42 U.S.C. § 12101 is the Americans with Disabilities Act ("ADA"), not the FMLA.  Supporting Memorandum at 11.  The FMLA is found at 29 U.S.C. § 2601, *et seq.*  However, because Coleman testified in depth about FMLA complaints she made, the court will analyze Coleman's retaliation claim under the FMLA.

or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Douglas v. DynMcDermott Petroleum Operations Company*, 144 F.3d 364, 372 (5th Cir. 1998), *cert. denied*, 525 U.S. 1068 (1999). Coleman acknowledged in her deposition that she made as many as twenty complaints to the Bank's advice and counsel department, claiming that she was treated differently. Appendix in Support at 061-62, Coleman Dep. 164:3-165:10. However, she stated that she did not believe this was because of her race. *Id.* As such, Coleman was not "opposing any practice made an unlawful employment practice" by Title VII or Section 1981, as both statutes govern employment discrimination on the basis of race. Furthermore, there is no evidence that Coleman ever "participated in any manner in an investigation, proceeding, or hearing" under Title VII or Section 1981. Thus, she was not engaged in a protected activity under Title VII or Section 1981.

Coleman's FMLA complaints were about her having to use paid leave concurrently with unpaid FMLA leave. Appendix in Support at 054-057, Coleman Dep. 152:20-155:23. However, as the defendants argue, an employer is allowed to require an employee to use paid leave concurrently with unpaid leave. 29 C.F.R. § 825.207(a). Supporting Memorandum at 13. Therefore, because the Bank did not violate Coleman's rights under the FMLA, Coleman was not engaging in an activity that was protected by the statute, nor was she opposing a practice made unlawful by the FMLA.

Moreover, Coleman provides no evidence of a causal connection between her FMLA complaints and her termination. "[I]n determining whether an adverse employment action was taken as a result of retaliation, [the court's] focus is on the final decisionmaker." *Ackel*, 339 F.3d at 385. The defendants provide ample evidence that the primary decisionmakers in Coleman's termination (Lollman, Dubman, Kaster, and Brock) were not even aware of Coleman's FMLA complaints. Appendix in Support at 003, Declaration of Cheri Lollman ¶ 12; Appendix in Support at 005, Declaration of Vincent M. Dubman ¶ 8; Appendix in Support at 007, Declaration of Jeremy Kaster ¶ 6; Appendix in Support at 009, Brock Dec. ¶ 6. If no decisionmakers in Coleman's termination even knew about her FMLA complaints at the time of termination, there can be no causal connection between the complaints and her termination. *Ackel*, 339 F.3d at 385-86 (holding the defendant was entitled to summary judgment because the people who decided to terminate the plaintiff were not aware of her complaints); *Chaney v. New Orleans Public Facility Management, Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."), *cert. denied*, 529 U.S. 1027 (2000). Therefore, Coleman has failed to establish a *prima facie* retaliation claim.

c. The Defendants Provide a Non-Discriminatory
Reason for Termination

Even if Coleman had established a *prima facie* case of racial discrimination or retaliation, the defendants have met their burden of articulating a legitimate, non-discriminatory reason for terminating Coleman. As stated above, the Bank asserts that Coleman was terminated due to the structuring activity Lollman discovered on Coleman's personal account. Because structuring is against the law, Coleman's conduct violated the Bank's employee handbook and code of conduct. Supporting Memorandum at 4. Violating the law, and as a result, an employee handbook and code of conduct are perfectly legitimate reasons for terminating an employee. See *Flanner v. Chase Investment Services Corporation*, 600 F. App'x 914, 920 (5th Cir. 2015) (upholding district court's conclusion that plaintiff's violation of company's code of conduct -- the defendant's explanation for discharging the plaintiff -- was "a non-discriminatory reason for [plaintiff's] termination").

d. Coleman Provides No Evidence of Pretext

Because the defendants have met their burden of articulating a non-discriminatory reason for termination, the burden shifts back to Coleman to "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Outley v. Luke & Associates, Inc.*, 840 F.3d 212, 218 (5th Cir. 2016). Pretext may be established "through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of

credence." *Id.* The issue is whether the employer's reason, "even if incorrect, was the real reason" for the employee's termination. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003). Furthermore, "a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." *Cervantez v. KMGP Services Company, Inc.*, 349 F. App'x 4, 10 (5th Cir. 2009). Finally, "an employee's 'subjective belief of discrimination' alone is not sufficient." *Auguster v. Vermillion Parish School Board*, 249 F.3d 400, 403 (5th Cir. 2001) (quoting *Bauer v. Albemarie Corporation*, 169 F.3d 962, 967 (5th Cir. 1999)).

Here, the defendants assert that Coleman has provided no evidence that she was terminated because of her race. As stated above, Coleman admitted that she never complained to anyone at the Bank that she was treated differently because of her race. Appendix in Support at 061-62, Coleman Dep. 164:3-165:10. Coleman further testified that nobody at the Bank made statements or comments to her, or engaged in any conduct that gave her any indication that Bank employees harbored a racial animus towards her. *Id.* at 060-061, Coleman Dec. 163:23-164:2. Also, as the defendants point out, Supporting Memorandum at 15, it seems that Coleman's only evidence that she was terminated because of her race is that Kaster and Brock, both white males, were decisionmakers in her termination, while Harrell, an African American, was not. *Id.* at 051, Coleman Dep. 149:11-17; *Id.* at 060, Coleman Dep.

163:11-17. This is simply not "substantial evidence" that shows the Bank's reason for terminating Coleman, structuring, was a pretext for discrimination. *Cheatam v. Blanda*, No. 1:08-CV-299, 2010 WL 2209217, at *5 (E.D. Tex. Apr. 23, 2010) ("[T]he law simply does not blindly ascribe to race all personal conflicts between individuals of different races because to do so would turn the workplace into a 'litigious cauldron of racial suspicion.'").

Also, it is irrelevant that Coleman denies she violated, or intended to violate, the law. As stated, the relevant inquiry is whether the employer's reason, even if incorrect, was the real reason for the employee's termination. *Sandstad*, 309 F.3d at 899. Coleman provides no evidence to call into question the Bank's belief that she had committed structuring. As the Bank asserts, Supporting Memorandum at 16, Coleman's own admission that she reduced the amount of a withdrawal after being told that a report had to be made is evidence that the Bank's belief was reasonable. Appendix in Support, 037-40, Coleman Dep. 117:17-120:15. Thus, Coleman has failed to meet her burden that the Bank's reason for terminating her was a pretext for racial discrimination. The defendants are entitled to summary judgment on Coleman's retaliation claim.

e. Coleman's Defamation Claim Against Kaster and Brock

In her second amended complaint, Coleman alleges that Kaster and Brock defamed her by publishing false statements accusing her of a crime, namely "money

laundering and fraud."  Second Amended Complaint ¶¶ 13, 21.  To maintain a claim

of defamation under Texas law, a plaintiff must prove that the defendant:

(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while

acting with malice, if the plaintiff was a public figure, or negligence, if the plaintiff

was a private individual, regarding the truth of the statement.  *WFAA-TV, Inc. v.*

*McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999).

The defendants assert that Coleman has not presented any evidence that Kaster or

Brock published a defamatory statement.  Supporting Memorandum at 17.

    A defamatory statement is "published" if it is "communicated orally, in

writing, or in print to some third person capable of understanding their defamatory

import and in such a way that the third person did so understand."  *Austin v. Inet*

*Technologies, Inc.*, 118 S.W.3d 491, 496 (Tex. App.--Dallas 2003, no pet.).  Coleman

testified that she had heard from co-workers that there was a rumor at the Bank that

she had been terminated for "fraudulent activity."  Appendix in Support at 022,

Coleman Dep. 17:4-6.  As the defendants duly note, Supporting Memorandum at 17,

courts in the Fifth Circuit have held that such testimony is inadmissible hearsay.

*Wells v. Shop Rite Foods, Inc.*, 474 F.2d 838, 839 (5th Cir. 1973) (per curiam)

(concluding that district court properly excluded witness' statement that

"[defendant's] employees had told him that they had heard that [plaintiff] had been

discharged for stealing" because "this testimony was hearsay."); *Westfall v. GTE*

*North, Inc.*, 956 F. Supp. 707, 713 (N.D. Tex. 1996) (Maloney, J.) (holding that co-workers' statements that plaintiff was terminated for "misuse of funds" were inadmissible hearsay); *Patton v. United Parcel Service, Inc.*, 910 F. Supp. 1250, 1274 (S.D. Tex. 1995) (finding inadmissible as hearsay the plaintiff's testimony that co-workers had heard that a missing baseball was found in his desk).

Even if Coleman's testimony were not hearsay, it still does not provide evidence that Kaster or Brock told anybody the reason for Coleman's termination. Coleman testified that three co-workers mentioned the rumor to her: Chinyere Elmore ("Elmore"), BB Jordan ("Jordan"), and another co-worked named Johnny. However, Coleman acknowledges that she cannot identify the person who told the co-workers the rumors. Appendix in Support at 022, Coleman Dep. 17:7-10; Appendix in Support at 063, Coleman Dep. 174:19-23; Appendix in Support at 064, Coleman Dep. 175:2-15. Furthermore, Coleman admits that other than the fact that Kaster and Brock knew that she was terminated, she had no reason to believe that they talked to anybody about her termination. Appendix in Support at 065, Coleman Dep. 176:13-17. Also, Elmore herself acknowledges that she "cannot recall" who spread the rumor regarding the reason for Coleman's termination. Appendix in Support at 012, Declaration of Chinyere Elmore ¶ 8. Finally, Elmore states that she "never heard any person in management state why Ms. Coleman was terminated, or even confirming that she had been terminated." *Id.* Therefore, Coleman fails to raise

a genuine issue of material fact as to whether Kaster or Brock published any

defamatory statements about her.  Accordingly, the defendants are entitled to

summary judgment regarding Coleman's defamation claim.

## III.  CONCLUSION

For the above stated reasons, the defendants' motion for summary judgment is

**GRANTED**.  Judgment will be entered for the defendants.

**SO ORDERED**.

August 4, 2017.

_____
**A. JOE FISH**
**Senior United States District Judge**